hPER CURIAM.
We reverse and remand this second degree murder verdict because of the legal errors committed during the jury selection process and the failure to grant a mistrial based on the continued display of a photograph of the victim at the prosecutor’s table and a witness wearing a T-shirt depicting the deceased victim. Two judges, concur, with separate reasons that inadmissible hearsay was improperly admitted at trial.

*380
PROCEDURAL HISTORY

Defendant Lonnie Allen was charged by grand jury indictment with first degree murder, a 'violation of La. R.S. 14:3o.[1] Defendant pleaded not guilty. Defendant withdrew motions to suppress the evidence and confession, and the trial court denied defendant’s motion to suppress the identification. Trial commenced on November 15, 1999. On November 16, 1999, this court denied defendant’s writ application pertaining to the trial court’s grant of the State’s motion in limine pertaining to defense evidence.[2] The Louisiana Supreme Court granted defendant’s writ application, reversing the judgment of the trial court, and ruling | ¡¿hat the relevancy of evidence is determined at the time it is offered.[3] The jury reached a verdict of guilty of second degree murder and defendant was sentenced to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence.

STATEMENT OF FACTS

On April 27, 1998, at approximately 9:30 p.m., Norman Royal, the decedent, was sitting on the front porch at 1802-1804 Music Street, New Orleans, Louisiana. He was with his friends, Robert Spriggens, Tremane Andrews, Reginald Davis, and Lawrence Clark, drinking beer. Suddenly, three men approached the group, one without a mask carrying a pistol, the other two armed and wearing partial or complete bandanas. The gunman threatened Norman Royal, fired two shots in the air, and robbed Robert Spriggens of $230. They attempted to herd the victims into the residence, when one of the robbers shot and killed Norman Royal, also wounding Robert Spriggens and Tremane Andrews. The felons fled in a red Pontiac automobile, which was eventually linked to Lonnie Allen, through statements made by his wife, Traleya Smith, and her mother, Linda Reeves.
New Orleans Police Homicide Detective Greg Hamilton investigated the homicide. When he arrived on the scene that night he observed the victim lying on the ground with blood all over him, trying to breathe. He noticed two other wounded persons. Reginald Davis was standing over the victim urging him to breathe. The detective later took a statement from Mr. Davis. The detective could not recall what information Mr. Davis gave him. Mr. Davis later was taken to view a red car, which he stated was not the one used by the perpetrators.
| sDetective Carlton Lawless also investigated the robbery/murder, and learned from his interviews that Norman Royal, Reginald Davis, Tremane Andrews, Robert Spriggens and Lawrence Clark had been sitting on the front porch of 1802-1804 Music Street drinking beer when three individuals robbed them. One grabbed Norman Royal by the neck, fired two shots into the air, and struck him twice in the head. Mr. Davis gave one of the robbers $230, and the robbers attempted to herd all of the people into one side of the double residence. Mr. Clark fled inside 1804 Music Street, at which time the robbers opened fire, fatally shooting Norman Royal in the neck, and wounding Mr. Sprig-gens in the forearm and Mr. Andrews in the chest.
*381 Det. Lawless identified photographs of the scene, as well as bullet fragments and a .38 shell casing recovered from the scene. Det. Lawless interviewed a neighbor, Mr. Sampson, who said he was asleep when awakened by the sound of gunshots. He looked out of his window across the street, where he observed three black males standing on the sidewalk in front of 1802-1804 Music Street, pointing guns at men on the porch of that dwelling. One gunman was aimed with one gun, the other two each had two guns, one in each hand. He could not identify anyone, because all he saw was silhouettes.
Reginald Davis informed Det. Lawless on the night of the shooting that the perpetrators fled in a red two-door Pontiac Sunbird, with a malfunctioning rear taillight and a commercial license plate containing the letter “A.” The next day Det. Lawless received a telephone call from Barbara Davis, the victim’s aunt, who raised the decedent. She gave the license plate number of what might be the vehicle used by the perpetrators. Det. Lawless contacted the Hertz Corporation, and learned that the car had been rented on April 27, 1998, at 5:29 p.m. to a female |4from Washington, D.C. Det. Lawless contacted Mrs. Davis, advised her that he had spoken to the two white females using the car. Det. Lawless concluded that this car was not involved, and continued to search for the suspect car. He subsequently received a telephone call from Reginald Davis that a red Sunbird was the vehicle leaving the scene. Det. Lawless put out a radio alert to be on the lookout for the vehicle in the area of N. Claiborne Avenue and Flood Street. A vehicle fitting the description was subsequently located in the 2100 block of Desire Street, parked in front of the home of defendant’s mother-in-law, Linda Reeves. Traleya Smith entered the vehicle, and she was subsequently stopped. The vehicle had a malfunctioning rear taillight. Reginald Davis identified the red vehicle. Det. Lawless interviewed Ms. Smith, who informed him that defendant used to be her boyfriend. She said that her mother, Linda Reeves, had rented the Pontiac Sunfire for Ms. Smith’s use. Det. Lawless identified a copy of an Enterprise Rental lease agreement, reflecting Ms. Reeves’ lease of a 1998, two-door, red Pontiac Sunfire, license plate number A507640. Det. Lawless identified a photograph of the rear of the vehicle, showing that the right rear taillight was not illuminated, due to what he discovered was a faulty electrical connection. Det. Lawless said that while speaking to Ms. Reeves he learned that Ms. Smith was married to defendant, and that they lived together at 6122 Music Street. The detective also learned that defendant used the Pontiac Sunfire most of the time. Ms. Smith subsequently admitted to Det. Lawless that she was married to defendant, that defendant used the vehicle most of time, and that on the night in question defendant used the car after he dropped her off at her mother’s residence. Det. Lawless said it was also brought out that defendant did not use the vehicle after that date, and that Ms. 1 KSmith had tried to get her mother to trade in the vehicle, claiming that it had some type of mechanical difficulty.
Det. Lawless subsequently prepared a photographic lineup containing defendant’s photo, and displayed it to Reginald Davis. Mr. Davis selected defendant’s photo. Robert Spriggens also identified defendant’s photo in a lineup. Mr. Spriggens told him that Thompson’s photo in the second lineup looked like one of the robbers, but that he did not want to accuse an innocent person. Lawrence Clark made a tentative identification of defendant; he said it looked like him but he did not want to accuse an innocent person. Tremane *382 Andrews and former New Orleans police officer Frank Oliver could not identify anyone in defendant’s photo lineup. Frank Oliver had been on N. Roman Street, where the perpetrators parked before walking around the corner to Music Street. Mr. Oliver identified a photo lineup of defendant’s co-defendant, Antoine Thompson. Tremane Andrews could not identify anyone in Thompson’s photo lineup. However, a wanted photo was run in the newspaper after an arrest warrant had been obtained based on Frank Oliver’s identification of Thompson, and Tremane Andrews said he immediately recognized Thompson as one of the robbers.
Det. Lawless stated on cross examination that a small clear bag containing four smaller bags of crack cocaine was found on a coffee or end table inside of 1804 Music Street on the night of the shooting. The deceased victim, Norman Royal, lived at that address. Det. Lawless conceded that Reginald Davis essentially misidentified the first red Pontiac Sunfire he saw. It was brought out that one of the initial officers on the scene wrote in his report that a witness said the getaway vehicle had four doors. The witnesses at the scene reported to him that two of the robbers wore bandanas, and that one of those had his bandana only Impartially covering his face. One robber wore no bandana. Reginald Davis said the unmasked robber shot Norman Royal. Det. Lawless said that the witnesses were emotionally distressed on the night of the shooting. Consequently, he only obtained a minimal description of one male with light brown skin and a moustache, somewhere between five feet nine inches and six feet tall. He said no one ever gave him defendant’s name and that defendant was developed as a suspect based on the getaway car. He said there were two ice chests full of beer on the porch, but that none of the surviving victims appeared to have been intoxicated. The crime scene photographs depicted five beer bottles at various locations in front of the residence.
No evidence was recovered from the search conducted at 6122 Music Street, where defendant and his wife resided, or the search of the red Sunfire that had been rented by defendant’s mother-in-law. Det. Lawless stated on redirect examination that, based on his investigation, defendant and Antoine Thompson were responsible for the death of Norman Royal.
Sergeant A1 Bowman testified that he and another sergeant supervised the crime scene investigation. Several days after the incident, he overheard a radio call from a detective that a red Pontiac Sunfire had been located. That detective observed a female enter the vehicle and drive off. When the detective reported that the right rear taillight of the vehicle was not operating, Sgt. Bowman, along with other officers, converged on the area and stopped the vehicle. The female driver, Traleya Smith, told officers that her boyfriend, the defendant, had access to the vehicle. But Sgt. Bowman said she was very evasive during questioning. They asked her mother, Linda Reeves, to come in and assist in the investigation. She advised officers that Ms. Smith and defendant were legally married, that she had ^rented the car for the couple, and that defendant was the primary driver. Sgt. Bowman said that he was not aware of any bandanas, fibers from bandanas, guns, or shell casings recovered during the search of the car.
Officer James Waiters arrested Antoine Thompson on June 17, 1999, by authority of an arrest warrant obtained by Det. Lawless on May 4, 1999. Detective Kevin Johnson arrested Lonnie Allen on May 5, 1999 by authority of an arrest warrant. Defendant was arrested at 6122 Music Street. His wife answered the door, and *383 said she had not seen him for about three weeks. Police found him in the attic. No bandanas or guns were found in the residence. Det. Johnson said his only connection with the case was making the arrest. No one asked him to test defendant’s hands to see if he had fired a gun.
Robert Spriggens testified that he was sitting near the bottom of the porch stairs, on the side of the stairs. Lawrence Clark was sitting in a chair on the porch, and Reginald Davis and Tremane Andrews were standing on the porch with Mr. Spriggens. The first gunman made his statement, and then walked up to Norman Royal. The gunman pointed his pistol at Mr. Royal’s head, and told the others not to move, or he would shoot Norman in his head. One of the other two gunmen fired a shot into the air. Reginald Davis gave the gunmen some money. The gunmen were trying to herd their victims into the residence. One of the gunmen said that someone was attempting to run. Mr. Sprig-gens could not say who said it, or who was ■trying to run. At that point, the gunmen began shooting. He was hit in his right arm as he dove for the floor of the porch, and Reginald Davis fell on top of him. He observed the gunmen back up while continuing to fire, and then disappear around the corner. Norman Royal was hit, but when asked where, he responded that he did not know. Mr. Spriggens went to assist Tremane Andrews. |sReginald Davis sat with Norman Royal; Norman and Reginald were cousins. Norman Royal was coughing up blood. Tremane Andrews had blood all over his shirt. Mr. Spriggens admitted that he was in shock. However, he later identified defendant’s photograph in a six-photo lineup shown to him on May 4, 1999. He said he saw defendant “clear as day,” and said that defendant was not wearing a mask. The police officer did not point to a photo for him to pick, or promise him anything. He thought he recognized Antoine Thompson’s photo in a second lineup, but was not sure.
Mr. Spriggens conceded on cross examination that he had seen the defendants in court before, when he testified on another occasion. He said he was never asked to give a description on the night of the shooting. He stated that following his release from the hospital, almost a week after the shootings, he talked to the other victims only once about the incident. He said he had a drink in his hand at the time the shooting began, and that he may have consumed one drink by that time. He said the three gunmen were facing the porch, and defendant was to the right. He recalled seeing “about” four guns.
Frank Oliver, a former police officer, admitted a prior conviction for sexual battery of a fourteen-year old female. He testified that on the night of April 27,1999, he was in a shed outside his home in the 1800 block of St. Roch Avenue, when he heard a car pull up. A few minutes later he walked from the shed to his residence, and glanced over his fence to see a male exit the driver’s seat of the parked car and walk toward Music Street. A few seconds later, he heard a single gunshot, followed by a barrage of shots. He immediately looked outside, and observed a different male run back to the car, jump in, and begin to drive off. A second male ran to passenger side of the car and entered the back seat. Mr. Oliver |9said the vehicle was red with an “A” on the license plate, which he said usually denoted a commercial or rental license plate. The right taillight was out. Mr. Oliver viewed a photographic lineup, and identified a photo of the individual who he saw exit the driver’s seat of the suspect vehicle that night. He also identified a photo in another photographic lineup. Further examination of Mr. Oliver established that defendant was not the person depicted in either one of *384 the photos that Mr. Oliver had selected. Antoine Thompson was one of them. The record indicates that at the hearing on the motion to suppress the identification, Mr. Oliver misidentified defendant as the person he had identified in the photographic lineup. At trial, he identified both defendants in court, one as the person who exited the driver’s seat, the other as the person who drove away. He said the person whose photo he identified in one photographic lineup was not present in court.
Tremane Andrews said that when one gunman pointed the gun at Norman Royal’s head and ordered them to “give it up” or he would “bust his head,” Reginald Davis gave the gunman the money he had in his pocket. The gunmen were not satisfied, and ordered them into the residence. Lawrence Clark started to run into the residence, and the gunmen opened fire. Mr. Andrews said that when he viewed the photos in the lineup, he said that Antoine Thompson could have been one of the gunmen, but that he was not sure. Mr. Andrews testified that he recognized the eyes, and said he had seen them before. He admitted that he could not identify anyone in defendant’s lineup. He said he could not talk to police officers at the scene because he had been shot.
Reginald Davis admitted prior burglary and cocaine convictions. He said defendant fired the gun, grabbed Norman Royal, said he would “bust him in his head” if they did not “give it up,” and struck Norman in the head. Mr. Davis said |inhe stood up on the porch and asked what was going on. Defendant ordered him to give him what he had in his pocket. He handed defendant the money he had in his pocket, and defendant ordered them inside. Then one gunman told them not to go into the residence. Lawrence Clark ran into Norman Royal’s residence, and at that point, defendant shot Norman Royal. Mr. Davis said he was focused on defendant because he was talking towards him and because defendant was holding his cousin, Norman Royal, at gunpoint. Mr. Davis said he picked defendant’s photo out of the photo lineup, identifying him as that gunman. Mr. Davis identified defendant in court. After the gunmen left, Mr. Davis went to Norman’s side, and held Norman as he died. As he cradled the victim, Mr. Davis heard a car start up around the corner, and watched as the vehicle came into his sight and sped off toward Franklin Avenue. He said it was a red Sunfíre or Sunbird, with what he characterized as a rental license plate on it. The passenger side taillight was out. Mr. Davis conceded on cross examination that he probably told police in a statement given on the night of the robbery that the three gunmen walked up together, but again reiterated that defendant appeared first. He also said he thought defendant had two guns, but could not explain how defendant took the money from him if that had been the case. Mr. Davis said he had drunk perhaps four beers during the hour before the robbery. He told police the gunmen had “automatics,” and reiterated at trial that the guns were “automatics.” He admitted calling police when he spotted a vehicle similar to the getaway car, and conceded that it did not turn out to be the car. Mr. Davis said that although police questioned him about two individuals he knew, “Mike” and “Player,” he told police the two were not involved in the robbery/shooting/murder.
InDetective Gregory Hamilton responded to the scene of the crime. He admitted that police may have been looking for drugs, because a canine was present, and officers were using the canine to search for anyone. He did not know if any of the victims were charged with any drug offenses they may have committed that night. He took statements from Reginald Davis and Lawrence Clark. He said Mr. *385 Davis was nervous and in shock, which he said was normal for someone having witnessed a murder. Det. Hamilton said that he had seen cases where a witness’s memory had improved after several days. He admitted that although Mr. Davis told him that two of the men had masks, and one did not, Mr. Davis could not describe them. He recalled that Mr. Davis told him about the red car, and about the taillight. When a tape of Mr. Davis’ statement was played, Det. Hamilton confirmed that Mr. Davis had responded in the negative when asked whether he had seen the license plate, or whether the vehicle even had a license plate. Det. Hamilton said that officers stopped a car on the night of the shooting that fit the general description given by Mr. Davis, and he transported Mr. Davis to the scene to view it. That vehicle was not involved. Det. Hamilton confirmed that the tape recorded statement of Mr. Davis reflected that he told the officer that Norman Royal had been robbed near the Music Street residence two weeks before the murder. Det. Hamilton reiterated on cross examination by the State that, in his experience, eyewitnesses to murders give more detailed answers to questions posed to them during follow-up questioning than they do at or around the time of the commission of the crime.
Officer Michael Labeaud confirmed that an initial police report written by his partner contained only the names of Tremane Andrews and Robert Spriggens, |1?and referred to an unknown victim. It did not contain the names of Reginald Davis and Lawrence Clark.
Jocelyn Thompson, Antoine Thompson’s mother, testified that she did not recognize defendant. She also stated that Antoine was at home with her at 1811 Flood Street on the night of the murder from 8:00 p.m. until she left the house between 10:30 and 11:00 p.m. His infant son was there with him. She said Antoine Thompson was a special student, and received supplementary social security income. He did not have a driver’s license or own a car, and she had never seen him drive. Mrs. Thompson conceded that she did not always see who picked up her son.
Valancia Favaroth testified that Antoine Thompson was the father of her baby and her fiancé. She did not know defendant. She said that prior to Antoine’s arrest she had been with him almost everyday, and she had never seen defendant. Antoine did not drive, and she had never seen him drive. On the night of the murder, she walked to Mrs. Thompson’s home after she got off work at the Walgreen’s located at 5500 St. Claude Avenue, arriving at the residence at approximately 11:15 p.m. Defendant was there when she arrived.
Dr. Richard Tracy, qualified by stipulation as an expert in the field of forensic pathology, testified that the victim died from a single gunshot wound that entered the neck and lodged in the chest, penetrating the right lung. The decedent also had superficial lacerations to the back of his head, which, he said, were entirely consistent with someone falling back and hitting concrete after being shot. Bile and urine samples were negative for street drugs, and there was a small amount of alcohol in the decedent’s blood.

.ERRORS PATENT

A review of the record reveals one error patent. Neither the transcript of the proceedings, nor the docket or minute entries, reflect that the verdict of the jury was delivered to the judge in open court as required by La.C.Cr.P. art. 810. Nor is it reflected anywhere that, as required by La.C.Cr.P. art. 811, the court ordered the clerk to receive the verdict, to read it to the jury, to ask the jury if the verdict was the one reached by it, and to record the *386 verdict. Nevertheless, the handwritten verdict of the jury, signed by the jury foreman, is contained in the record. That verdict is guilty of second degree murder. Defendant raises no assignment of error pertaining to this patent error, and the error has not affected his substantial rights. Accordingly, the error is deemed harmless. See La.C.Cr.P. art. 921.

ASSIGNMENT OF ERROR NO. 1

In this assignment of error, defendant claims he was denied his right to a fair trial by the trial court’s holding court until at least 3:00 a.m. on the first day of trial. Selecting a jury is of extreme importance and is thus the first stage of a jury trial. In a capital murder trial, voir dire has Federal and State constitutional standards that guarantee that “a trial is unfair if the accused is denied counsel at a critical stage of his trial.” United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).
The purpose of voir dire, from a judicial perspective, is to select an unbiased panel in the shortest time possible. To the lawyers and the litigants, voir dire is the most important aspect of the trial for various reasons. Thus, voir dire must be afforded such time and attention that something this significant deserves.
The process of selecting jurors is an intense, competitive and combative process of deselecting prospective jurors. Attorneys on both sides attempt to |uremove jurors apparently unfavorable to their side or favorable to their opponent. This process of deselection is a difficult task because of the restricted amount of time available for jury selection. The role of the judge is to balance the time available against the rights of the parties, so that the parties receive a fair trial.
A criminal defendant is entitled to have legal counsel that is conscientious, responsive and cognizant, and, in the context of this case, awake and conscious. Lawyers, during voir dire, must be able and alert in order to extensively question jurors for a reasonable period of time to obtain enough information to make a thoroughly informed judgment. An exhausted and prostrate trial lawyer, especially in a capital murder case, cannot provide effective counsel to his/her client. Without sufficient energy and zeal the trial lawyer cannot ferret out a prospective juror who conceals extremely strong biases and thereby properly exercise a challenge.
Prospective jurors, likewise, cannot be driven to exhaustion. Their responses to the court and counsel require that they engage in a dialogue about matters that relate to their personal lives and philosophy. An alert and responsive prospective juror will readily provide answers. Sleepy and angry jurors will evade and avoid questions in order to end the selection process. Thus, depriving a defendant of critical information about a juror because of exhaustion, fatigue and excessive time span creates a presumption that the defendant was prejudiced by this deficiency. (See Burdine v. Johnson, 262 F.3d 336, 2001 WL 914267 (5th Cir.(Tex.) 2001) for a discussion of presumption of prejudice in capital murder cases.)
The record reflects that on the first day of trial, November 15, during voir dire, the court interviewed each prospective juror in chambers with regard to the Wither-spoon, or death penalty issue. After the conclusion of the Witherspoon voir |1fidire, counsel for both defendant and Antoine Thompson objected to beginning the general voir dire. Counsel for Antoine Thompson represented that it was then 10:00 p.m., and said “we’ve” been here for over twelve hours. Counsel speculated *387 that the jurors had been in the court budding as early as 8:00 a.m., and opined that he did not think a lot of them could digest new information until 12:30 a.m. Counsel then stated that in all fairness to his client he did not believe it was right to keep the jurors until 12:00 or 1:00 a.m. Counsel for Lonnie Allen noted that he had a headache, and stressed that it was a capital case and that his client had a right to have competent counsel representing him. He argued that he had to be able to make intelligent decisions to effectively represent his client, and that proceeding until 1:00 a.m. would deprive his client of effective assistance of counsel. The trial court allowed a thirty-minute break, but said that it was going to finish the voir dire that night. The trial court noted that there were hotel rooms set aside for the jurors that night.[4] A prosecutor said that the State was ready to go forward. However, it can be noted that during subsequent voir dire, while addressing the jury, that same prosecutor referred to earlier in the day when he was “a lot fresher and awake.”
At the outset of the first of four rounds of the general voir dire, the prosecutor requested the undivided attention of the prospective jurors, noting that he understood that it was very late, and that they had started in the morning “very, very early.” During the first round of voir dire, counsel for defendant, who addressed the jury last in that round, said “good morning” to the panel of prospective jurors, and said, “Anybody have some problems concentrating, focusing right now? Staying awake? Anybody want to leave and go home right |1finow?” Counsel for defendant then requested that the record reflect that all of the jurors had raised their hands. Following the close of the first round, with the selection of four jurors, counsel for Antoine Thompson noted for the record that he had seen prospective jurors in the audience fast asleep, and could hear some of them saying they could not keep their eyes open. Mr. Smith, counsel for Thompson, conceded that he had not seen any jurors sleeping in the jury box, but wanted the court to note his objection for the record.
At approximately 1:05 a.m., during the second round of voir dire, counsel for defendant addressed the prospective jurors, noting that each and every one of them at that point was “completely wrecked.” Counsel said he recognized that some of them might be upset or mad, but pleaded that they not direct their anger or frustration toward defendant. Later during the second round, counsel for defendant asked a prospective juror in a panel being questioned whether he had been shaking his head [in response to a question] or just trying to stay awake. The juror responded, “I think I was just trying to stay awake. I don’t remember.” Also during the second round, counsel for Antoine Thompson informed the prospective jurors that he would stop at no later than 2:00 a.m., and when he went past that time, acknowledged that everyone was watching the clock. The second round of voir dire concluded at some point after 2:00 a.m., with the selection of three more jurors. During the third round of voir dire, counsel for defendant asked if any of the prospective jurors would have a problem going until 2:00 or 3:00 a.m. during the trial, and one juror responded, “Yeah, I have a problem with it.” Another juror said, “Absolutely. You’re going to lose [sic] attention span very easily.” The trial court interjected that counsel did not know what time they would quit each night. Counsel again asked if anyone would have a prob *388 lem with going fourteen or [ 17fifteen hours a day into the presentation of evidence, and one juror responded in the affirmative. During the third round of voir dire, counsel for Antoine Thompson assured prospective jurors that he would finish his part of the third-round by 2:45 a.m. A fourth round of voir dire followed the third.
The record reflects that voir dire was not concluded until at least 3:00 a.m. on the morning of November 16. In addition, it can be noted that one counsel had earlier mentioned that the jurors would have to be transported by sheriffs deputies to their places of residence to gather their personal belongings, then be transported to the hotel where they were to be sequestered. The record indicates that trial was to have commenced later that morning at 11:00 a.m. However, one defense counsel was not present, and trial did not commence until after lunch. On November 17, prior to commencement of the third day of trial, counsel for Antoine Thompson noted that he had overheard at least one female juror say the previous day that she had not gotten one minute of sleep on the night of November 15-16. Counsel moved for a mistrial on the grounds that it was error to have kept the jury until 3:00 a.m. The trial court disagreed that the juror made that statement, and denied the motion for mistrial.
A defendant is guaranteed an impartial jury and a fair trial. La. Const, art. I, § 16. To this end, La. Const, art. I, § 17 guarantees that “[t]he accused shall have the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily.” See also La. C.Cr.P. art. 786 (“the defendant shall have the right to examine prospective jurors”). The purpose of voir dire is to determine qualifications of prospective jurors by testing their competency and impartiality in order to discover bases for challenges for cause and for the intelligent exercise of peremptory challenges. State v. Taylor, 93-2201, p. 23 (La.2/28/96), 669 So.2d 364, 377, citing State v. Hall, 616 So.2d 664, 668 (La.1993); State v. Searles, 94-0190, p. 3 (La.App. 4 Cir. 12/15/94), 647 So.2d 1329, 1331. A trial court has great discretion as to the conduct of voir dire, and its rulings related thereto should not be disturbed absent a clear abuse of discretion. State v. Robertson, 97-0177, pp. 10-11 (La.3/4/98), 712 So.2d 8, 20.
In the instant case, it can be assumed that the jurors reported for duty no later than 8:30 a.m. The individual jurors underwent voir dire as to their ability to render a sentence of death, the Witherspoon issue, until 10:00 p.m. At that point, they had been fulfilling their civic responsibilities as jurors for thirteen hours. Voir dire did not conclude until, at the earliest, five hours later, at approximately 3:00 a.m. Thus, the jurors endured an eighteen-hour day. Jurors were noted sleeping in the audience. At some point between midnight and 1:00 a.m. all of the jurors indicated by a show of hands that they were having problems concentrating, focusing, and staying awake. When asked if they could go until this late hour during the trial, several jurors indicated they would have problems.
The trial court was faced with the sequestration problem in this death penalty case. However, La.C.Cr.P. art. 791(B) requires that jurors in a capital case be sequestered only after each is sworn. When defense counsel for both defendants requested that voir dire be continued until the next morning at 10:00 a.m., after the jury had been present in the courthouse for thirteen hours, no juror had been sworn, or even selected. The only issue that had been voir dired was the Wither-spoon issue. The general voir dire had not *389 yet begun at that time. There was no justification for beginning the general voir dire at 10:00 p.m. in this death penalty prosecution. That the City of New Orleans reserved hotel rooms for the twelve jurors and alternates for that night cannot outweigh the right of a defendant |1flcharged with a capital offense to a fair and effective voir dire. In State v. Taylor, supra, one defendant was charged with one count of first degree murder. Jury selection took eleven days. Prospective jurors would return home each evening. Even after jurors were chosen, they were instructed to return home until the trial began. The individual jurors were admonished not to discuss the case, not to listen to news accounts about the case, and not to read written reports about the case during the interim between their selection and the commencement of trial. In the instant case there was no justifiable reason why the trial court could not have concluded the day’s proceedings at 10:00 p.m., at the end of the Witherspoon voir dire, and resumed the general voir dire the next morning.
Under the facts and circumstances of the instant case, the trial court clearly abused its discretion in conducting voir dire until 3:00 a.m. It is impossible to assess the full extent to which defendant’s right to a fair and effective voir dire was compromised by the exhausting day endured by the prospective jurors and counsel. In objecting to proceeding into the early morning hours of November 16, counsel for defendant specifically voiced concern about his ability to make intelligent decisions at that late hour. The importance of the constitutionally guaranteed right to voir dire cannot be overemphasized. We hold that the trial court abused its discretion in conducting the voir dire beyond a reasonable time limit, thus exhausting defendant’s counsel, in a critical phase of the defendant’s capital murder trial which warrants a presumption of prejudice and entitles the defendant to a reversal of the verdict and a new trial.
| ASSIGNMENT OF ERROR NO. 4
In this assignment of error, defendant claims the trial court erred in failing to grant a mistrial based on the continued display of a photograph of the victim at the prosecutor’s table, and a witness’ wearing of a T-shirt depicting the deceased.
The State presented a photograph of the victim to his aunt for identification. Three witnesses later, during the testimony of Det. Lawless, counsel for defendant objected to the continued display of the photograph on the State’s table. The trial court directed that the State refrain from displaying the photo unless it was being used in connection with the testifying witness. The next day, prior to the first witness of the day taking the stand, counsel for defendant objected to the display of the photo on the State’s table, and requested that the court admonish the jury as to the photo. The prosecutor noted that Det. Lawless, the last witness to testify the previous day, had referred to the photograph during his testimony, and that he was going to be the first witness called by the State that morning. The trial court instructed the State to take down the photograph. Det. Lawless was subsequently recalled as the first witness of the day.
In State v. Johnson, 94-0236 (La.App. 4 Cir. 3/16/95), 652 So.2d 1061, writ denied, 95-1752 (La.2/21/97), 688 So.2d 524, this Court set forth the general rules applicable to photographic evidence as follows:
Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted, are generally admissible. State v. Kirkpatrick, 443 So.2d 546 (La.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d *390 847 (1984); State v. Hartman, 388 So.2d 688 (La.1980). The test of admissibility is whether the probative value of the photograph outweighs the possible prejudice which might result from its display to the jury. State v. Moore, 419 So.2d 963 (La.1982); State v. Jones, 381 So.2d 416 (La.1980). Determining the proper use of photographs at trial is generally within the sound discretion of the trial judge. State v. Kelly, 362 So.2d 1071 (La.1978), cert. denied, 439 U.S. 1118, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).
121We acknowledge the discretion granted to the trial Judge to regulate evidence, particularly photographs. A photograph is viewed as a graphic portrayal of oral testimony and becomes admissible only when a witness has testified that it is correct and accurate representation of relevant facts personally observed by the witness. McCormick On Evidence § 214. In this case, the only purpose of the State to continuously display the decedent’s picture was to personalize and evoke sympathy for the deceased. The trial Judge must balance with judicial discretion the probative danger of jury prejudice against the rights of the defendant to a fair trial. It should have been removed from the juror’s view except for when it was needed by a witness during testimony.
Tremane Andrews testified while wearing a T-shirt emblazoned with a photograph of the victim. Counsel for defendant objected to the T-shirt, and the trial court noted the objection for the record. We find that the trial judge erred in failing to order the witness to change his clothing before testifying. The wearing of a T-shirt with the picture of the victim is a visual message, solely for the purpose to promote pity for the victim and arouse the passion and prejudice against the defendant for the crime. Badges, signs, and other forms of visual information or signals that the trigger anger, revenge or excessive emotions for or against a party violate a defendant’s right to a fair trial guaranteed by the 6th amendment to the United States Constitution and Art. I § 13 of the Louisiana Constitution. The two, together, the photograph and T-shirt, were intended to unduly influence the jury against the defendant and so prejudiced him, that he was denied a fair trial and is grounds for reversible error.
| ¡gjWe pretermit addressing and reserve to the defendant the other assignment of errors. For the reasons set forth, the defendant’s conviction and sentence is reversed and the case remanded to the district court for a new trial, not inconsistent with the rulings explained herein.
REVERSED AND REMANDED.
PLOTKIN and TOBIAS, JJ., concur.

. Defendant was jointly indicted and tried with Antoine Thompson. The jury deadlocked as to Antoine Thompson.

. State v. Allen, unpub., 99-2890 (La.App. 4 Cir. 11/16/99).

. State v. Allen, 99-3257 (La.11/17/99), 750 So.2d 207.

. The court noted at the commencement of trial the next morning that the City would have been mad had the hotel rooms gone unused.