EDWIN A. LOMBARD, Judge.
 

 | jThe defendant, Terrell Hathorn, appeals his conviction and sentence. After review of the record in light of the applicable law and arguments of the parties, we affirm the defendant’s conviction and sentence.
 

 Relevant Facts and Procedural History
 

 On October 24, 2008, Anthony Reed was the victim of an armed robbery that occurred near his worksite on October 24, 2008. In December 2008, the defendant was charged with one count of armed robbery in violation of La.Rev.Stat. 14:64. He pleaded not guilty and in September 2009, after being found competent to proceed to trial, was found guilty of simple robbery, a violation of La.Rev.Stat. 14:65, by a twelve-person jury.
 

 The following evidence was adduced at trial. The victim, an electrician, testified that on the day of the robbery he was working at 3000 Pauger Street when a person he knew only as Jay, accompanied by the defendant and another man he knew as Curly, came to his worksite to ask for work or a loan. Reed told Jay that he had no money at that time but to come back later and he would give him a little money. Shortly thereafter, while Jay and the defendant were standing in front of the residence, Reed’s employer arrived and paid him $1500.00. Jay came inside the house as his employer was counting the money and then left. Ten minutes 12Iater, the defendant came inside asking if Reed had seen Jay. Reed told him Jay had gone down the street. The defendant returned a short time later, again asking for Jay and again leaving after Reed told him he did not know where Jay had gone. Notably, on the defendant’s second visit Reed’s employer’s son was at the house. When the defendant returned a third time asking for Jay, after his employer’s son left the worksite, Reed became nervous and gathered his tools to leave. Jay returned while he was preparing to leave and Reed gave him a few dollars. Shortly thereafter, the defendant returned yet again, looked in the open doorway, and said to someone outside, “That’s him right there.” The defendant stepped away from the doorway and an unknown man came to the doorway, looked inside, and then said to someone out of view, “Who you [sic] talking about? Is that him?” The man stepped away from the door, and the defendant walked back up to the door, looked inside, and told someone out of view, “Yeah, that’s him.” The other man reappeared, pulled a gun, and told the defendant, “Well, see what he got [sic]. Go in his pocket and see what he got [sic].” The defendant hesitated a moment, reached into Reed’s right pants pocket and retrieved $15.00. The gunman told the defendant to hurry and ordered Reed to turn around. Reed did so, and the gunman put the gun into his back and reached into Reed’s left pants pocket, taking the $1500.00. Both men fled with demeanors Reed described as “smirking.”
 

 Reed called 911 on his cell phone and followed the two men riding away on a bicycle, the defendant pedaling and the gunman riding on the handlebars. Upon seeing Reed following in his truck, the men sped up. Reed, talking to the 911 cell phone operator, followed at a distance until the gunman jumped off of the bike and ran
 
 *1144
 
 away. Reed followed the defendant until he abandoned the bike, turned, and put his hand in his pocket as if he had a gun. Upon being told by Reed that he[sknew he did not have a gun, the defendant ran in the opposite direction behind a house. Reed, still on the phone with the 911 operator, started to exit his truck but the police arrived just as the defendant came out from behind a house. Reed pointed him out to officers and the defendant told the officers that he had been arguing with Reed about a table.
 

 Reed identified a photograph of the residence where the robbery occurred and positively identified the defendant as the man who pointed him out to the gunman and first searched his pocket for the money. He stated that he had never seen the gunman prior to the day of the robbery. Reed conceded that he had prior convictions in 1989 and 1991 for possession of cocaine, battery of a police officer, and attempted unauthorized entry of a business. The State played the 911 tape for the jury, but the tape has not been transcribed for the record.
 

 On cross-examination, Reed denied that Curly was the gunman. He reiterated that he called 911 as soon as the robbers left and exited the residence to see the defendant riding away with the gunman on the bike handlebars. He again stated that that he followed the bike from a distance because he knew that the gunman was armed. He conceded that the defendant did not pretend to have a gun during the robbery. He estimated that thirty to forty-five minutes elapsed between the time Jay first approached him for money and the actual robbery. He testified that Jay and Curly were in the area during the robbery, although he did not remember if this fact had been related to the police. He did not remember hearing the gunman tell the defendant to get on a bike and leave. Reed explained that his statement on the 911 tape that “he helped” was made after the police stopped the defendant and the defendant told the officers that he and Reed had gotten into an argument. He admitted that that his statement on the 911 tape, “I’ll kill him,” | ¿referred to the defendant. He insisted that he did not see the gunman or anyone else point a gun at the defendant, the defendant was standing with the gunman when the gunman drew the gun, and the gun was trained on Reed during the entire robbery.
 

 Mary Knight, a supervisor for the Communication Division of the New Orleans Police Department (NOPD), identified the 911 tape from the armed robbery, as well as the printout of the tape. During her testimony, the State played the tape a second time.
 

 Officer Terry Bean, the NOPD officer who responded to the armed robbery call, testified that he saw a male in the area of Hope and St. Anthony Streets that fit the description of one of the robbers going over a fence. When he approached the man whom he identified as the defendant, the defendant immediately told him that he did not know “that dude.” Officer Bean detained the defendant as Reed arrived and Reed yelled that the defendant was “that guy.” He arrested the defendant and recovered a bike a few feet away in an open lot.
 

 On cross-examination, Officer Bean testified that he first saw the defendant going over a gate between two abandoned houses. The defendant told him that he did not rob “that dude;” that he did not have a gun; and that the other guy had one. He admitted that the defendant did not try to run from him but noted also that the defendant did not have an opportunity to do so. Officer Bean testified that Reed never told him that the defendant had a gun and that the defendant had no money in his
 
 *1145
 
 possession when he was arrested. He stated that Reed was upset when he confronted the defendant at the scene of the arrest. The defense repeatedly played portions of the 911 tape which apparently included Reed’s comment that he would “kill him,” but Officer Bean stated that he must not have been present when Reed |smade this statement. He testified that he did not remember if Reed told him that Jay and Curly were present for the robbery. Officer Bean admitted that at a prior hearing he testified that the defendant told him that the gunman forced him to put his hand into the victim’s pocket.
 

 The defendant testified in his own defense. He was eighteen years old and admitted to being present during the robbery, but insisted he did not know the gunman. On the day of the robbery, he met up with Jay (who was riding a bicycle) and Jay agreed to help him find a job. They met up with Curly, also riding a bike, who said he knew where they could find jobs. Curly took them to the construction site on Pauger Street. He denied repeatedly returning to the house asking for Jay. Instead, he claimed that he and Jay parked their bikes on the sidewalk while Curly went into the house to speak with Reed. According to the defendant, another man rode up on yet another bike and asked Reed about a table that was sitting at the curb. Reed indicated that he did not want to give the table to the man and the two men exchanged words. The man then drew a gun and pointed it at both Reed and the defendant who happened to be standing between them. The defendant testified that Curly and Jay fled at that point. He insisted that the unknown gunman told him, ‘You know what time it is. Go in his pocket.” He only searched Reed’s pocket because he was afraid of the gunman. After the robbery, the gunman told him to leave on one of the bikes so he picked up one of the bikes and rode off by himself. He denied smirking as he rode away, insisting that he was saddened because he realized that he had done something wrong because he was afraid of the gunman. He denied that he left the scene with the gunman on his handlebars. The defendant denied saying anything to Reed while at the house but told Reed upon being chased that he did not rob him to which Reed replied, ‘You know what you | fidid,” a statement that apparently appears on the 911 tape. The defendant alleged that he fled because Reed tried to run over him with his truck. When the police arrived, he got off of the bike near an abandoned house and speed-walked over to the officers, seeking their protection from Reed. He immediately told the officers that he did not rob Reed and that the gunman forced him to search Reed’s pocket. He maintained that he did not run when the gunman produced the gun because he was afraid the gunman would shoot him and, accordingly, believed he had no choice but to search Reed’s pocket. The defense counsel repeatedly played portions of the 911 tape but, again, those portions are not transcribed into the record.
 

 On cross-examination, the defendant admitted that he had a prior conviction for possession of marijuana. He stated that he had known Jay since they were children and denied that Jay asked Reed for any money or that Jay told him that Reed had just gotten paid. The defendant denied telling anyone, “That’s him.” He asserted that he only searched one of Reed’s pockets and gave the money recovered from the pocket to the gunman. Although the defendant first claimed that the gunman never told Reed to turn around or put the gun in Reed’s back, he testified on redirect that the gunman went into the house and searched Reed’s other pocket. The defendant insisted that the gunman did not
 
 *1146
 
 leave with him on the bike and that he did not know where the gunman went after the robbery. The defendant reiterated that he began slowly riding home after the robbery and described the circuitous route he took after realizing that Reed was chasing him. He insisted that Reed kept trying to hit him with his truck and maintained that once he saw the police officers he sought their protection from Reed as well as the gunman.
 

 |7After deliberations, the jury found him guilty of simple robbery and, on October 9, 2009, he was sentenced to serve four years at hard labor, two years of which were suspended, with two years of active probation and $1500 in restitution.
 

 Discussion
 

 The defendant appeals his conviction, arguing that the trial court’s failure to grant a mistrial after the prosecutor made improper arguments in its rebuttal closing argument
 
 [1]
 
 was reversible error.
 

 Generally, the scope of closing arguments is confined to “evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.” La.Code Crim. Proc. art. 774. However, the prosecutor is allowed wide latitude and the trial judge has broad discretion in controlling the scope of closing argument
 
 State v. Casey,
 
 1999-0023, p. 17 (La.1/26/2000), 775 So.2d 1022, 1036. Accordingly, a conviction will not be reversed based on a prosecutor’s improper argument unless the court is thoroughly convinced that the improper argument influenced the jury and contributed to the verdict.
 
 Id.
 
 (citations omitted).
 

 The defendant first points out that he filed a motion
 
 in limine
 
 prior to closing argument to prohibit the State from making any argument that: (1) amounted to a personal assurance by the prosecutor concerning any evidence that the State presented; (2) appealed to prejudice by referring to societal impact of crime or the consequences to society of the jury’s verdict; and (3) was a personal attack on defense counsel or defense strategy. The court granted the motion in part, finding that the prosecutor could comment on defense strategy. The defendant then quotes |stwo sections of the prosecutor’s rebuttal argument that he argues entitle him to a mistrial. First, after describing an armed robbery as occurring when someone points a gun at a victim and demands money upon pain of death, the prosecutor pointed out that sometimes an accident happens during an armed robbery and turns the crime into a murder: “Someone slips, the gun goes off, Mr. Reed is dead.” The defense counsel objected, asserting that the prosecutor was appealing to prejudice and bias. The court overruled the objection, and the prosecutor continued:
 

 STATE:
 

 And he doesn’t want you to hear that, ‘cause he knows it’s true, that it is an armed robbery—
 

 DEFENSE:
 

 I’m going to object that that’s an—
 

 STATE:
 

 —it’s an act of almost murder.
 

 DEFENSE:
 

 —attack on the objection by the, by counsel. That’s a direct attack on the objection by counsel. Objections are proper, Judge. I can object. He can’t
 
 *1147
 
 say I want to object because you don’t want to hear it.
 

 JUDGE:
 

 All right. Sustained.
 

 DEFENSE:
 

 Move to strike since it’s been sustained.
 

 JUDGE:
 

 They will be advised when I rule on an objection and it’s been sustained that that is not evidence for them to consider. DEFENSE:
 

 Thank you.
 

 The prosecutor continued his argument by noting that although the defendant was a young man and did not have a gun during the robbery, he was still | involved and should be held accountable, imploring the jury not to be swayed by sympathy for the defendant. The following then occurred:
 

 STATE:
 

 That is not the proper way to decide this case as jurors. What kind of message does that send to him if you tell him, “well, it’s okay, ‘cause you look young, that we’re not gonna [sic] find you guilty? We know you did it, but we just feel sorry for you, ah, ‘cause you told you told us that was [sic] the first time you looked at a map [sic], even though he got the exact direction to his house right. That is not the proper way to decide this case as jurors. What kind of message would it send to the victim? You know how hard it is to get victims to come to court in Orleans Parish?
 

 DEFENSE:
 

 Objection, your Honor. This was the subject of a Motion in Limine. Chambers?
 

 JUDGE:
 

 I’ll sustain.
 

 DEFENSE:
 

 And move to strike.
 

 JUDGE:
 

 Continue, Mr. Ranier.
 

 STATE:
 

 What does that say to the victim, a man who started off on the wrong track, also involved in drugs and criminal activity, and he has turned himself around to be his own self-employed electrician, who really busted his butt that whole week to finish the job, and he gets paid? What does it say to him? What does it say to him about having the courage to come to court to testify? What kind of message does it send to him? A guilty verdict—
 

 DEFENSE:
 

 Objection. This is still improper, Judge.
 

 JUDGE:
 

 He’s referring to—
 

 DEFENSE:
 

 It’s not about sending messages. It’s whether they’ve met the burden of proof.
 

 ImJUDGE:
 

 He’s referring to the victim himself. DEFENSE:
 

 Understood, Judge.
 

 JUDGE:
 

 Overruled.
 

 DEFENSE:
 

 It’s whether they’ve met the burden of proof.
 

 JUDGE:
 

 Let Mr. Ranier continue, please. It’s closing arguments.
 

 The prosecutor then continued with his appeal to the jury to return a guilty verdict to hold the defendant accountable.
 

 During jury instructions, the court reminded the jurors that any statements made by the attorneys during trial were not evidence. The court then instructed that during closing arguments, “the attorneys were permitted to present for your consideration their contentions regarding
 
 *1148
 
 what the evidence has shown or not shown and what conclusions they think may be drawn from the evidence.... As jurors, you are not to be influenced by mere sympathy, passion, prejudice, or public opinion. You are expected to reach a just verdict.”
 

 After the jury retired for deliberations, the defense counsel moved for a mistrial based on the prosecutor’s statement concerning what a not guilty verdict would say to “the people of Orleans Parish.” The prosecutor responded that he did not make this statement, and the court agreed, noting that the prosecutor’s statements were tied to what a verdict would say to the victim and the defendant. The defense counsel then stated: “There was an objection sustained by the Court, Inah, and that’s the basis for the, ah, for the motion.” The court denied the motion, and the defense counsel continued:
 

 Also, um, talked about, commented on an objection by Defense counsel. That’s, that’s an attack on the Defense counsel. Um, it’s improper to comment on an objection. He said, Defense counsel, doesn’t want you to hear, ah, something. And that also should be grounds for a mistrial, your Honor.
 

 Um, in particular, just for the record, the, ah, ah, the first, ah, request for a mistrial was, ah, based in part on the Motion in Limine to Bar Improper Closing Argument, um, and also any other, ah, relevant constitutional statutory [sic] authority under either state or federal law.
 

 JUDGE:
 

 Okay. Both are denied. There’s no basis for a mistrial at this point.
 

 The defendant argues on appeal that these improper statements made by the prosecutor entitled him to a mistrial. He contends that the first statement, concerning the possibility that the victim could have been shot and killed during the robbery, was in contravention of the evidence presented at trial, designed to inflame the jury, and unduly prejudicial. The defendant asserts that the second comment (that defense counsel objected in order to keep the jury from hearing the prosecutor’s argument) was a personal comment on defense counsel that the court had earlier ruled would not be allowed. He also argues that the prosecutor’s statements concerning the impact of a not guilty verdict on the victim and the defendant, were “brutal incitements to convict that were not based on the evidence.” Finally, the defendant declares that any error in the trial court’s failure to grant a mistrial cannot be harmless because of the “weak” case presented by the State to prove his guilt.
 

 |12Our review indicates that the prosecutor’s statements were directed to the effect on the victim and the defendant, not society at large, if the jury returned a not guilty verdict. Even if these statements could be considered to be a plebiscite on crime, their effect was harmless and cannot be said to contribute to the verdict, especially given the jury’s decision to return a lesser verdict. Moreover, even accepting
 
 arguendo
 
 that the prosecutor’s comments were outside the proper scope of closing arguments,
 
 [2]
 
 the defendant is still not entitled to relief because in order to reverse a conviction based on misconduct during closing arguments, we must be thoroughly convinced that the argument influenced the jury and contributed to the verdict. Our review of the record does not
 
 *1149
 
 support such a finding. Rather, the record refutes the defendant’s contention that the evidence presented by the State was “weak.” The victim’s testimony, if believed, proved that the defendant willingly participated in the robbery of the victim. The jury, faced with the contradictory testimony of the victim and the defendant, apparently chose to believe the victim.
 
 See State v. Johnson,
 
 2009-0259 (La.App. 4 Cir. 9/16/09) 22 So.3d 205,
 
 writ denied,
 
 2009-2263 (La.4/16/10), 31 So.3d 1054 (fact finder’s credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence). Accordingly, we find no merit in the defendant’s assignment of error and a review for errors patent reveals none.
 

 |
 
 iaConclusion
 

 The trial court properly denied the defendant’s motion for mistrial. Accordingly, the defendant’s conviction and sentence are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . The trial court sustained the defendant's objection to statements made by the State in closing arguments, but denied the defendant’s motion for a mistrial (based on the objectionable statements) that was made after the jury had been instructed and retired for deliberation.
 

 [2]
 

 . The defendant cites
 
 State v. Allen
 
 without citation as supporting authority for his claim. It is likely that the defendant refers to
 
 State v. Allen,
 
 2000-0346 (La.App. 4 Cir. 10/17/01), 800 So.2d 378, but, if so, that case is easily distinguished. In
 
 Allen,
 
 this court found reversible error in both the trial court’s decision to conduct voir dire until 3:00 a.m. and in its denial of the defendant’s motion for mistrial based upon the prosecution's display of the
 
 *1149
 
 deceased victim's photograph on the prosecution's table during the entire trial and upon the fact that a witness wore a T-shirt with the victim's photograph on it while the witness testified.